# Matthews v. Commonwealth.

(Decided Nov. 26, 1935.)

G. W. STEPHENS and R. S. ROSE for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

James Matthews was indicted and convicted in the McCreary circuit court for the willful murder of Cleve Spradlin, and his penalty fixed at death. He appeals.

It appears that the decedent left his home on the morning of the homicide at about 4:30 a. m., had worked all day in the mines and quit work at about 5 o'clock p. m., and started home with some of his fellow workers. At a point on Trace Branch he left his companions and turned off on a path leading across the hill to his home—the usual route of his travel to and from his work. He was fully clothed at the time he left his companions, with a miner's cap, shoes, socks, and overalls, and had a check or voucher in his pocket for $9.32 which he had that day received from his employer. Not having appeared at home on that night, on the next morning his father and his companions who last saw him on the evening before, and perhaps others, set out in search for him, and on that day his half-clothed dead body was found by the searchers lying about 30 yards from his home and about 75 yards from the road where he had been thrown over a cliff. He had been shot with a 22-caliber rifle, one shot taking effect in the back of his head, which apparently produced instant death.

Appellant formerly lived in Tennessee but had come to Whitley county, Ky., a few months previous to the homicide and had been living with his uncle-in-law, Cal Massingill, and on the day previous to the homicide he left Massingill's home, intimating he was going back to Tennessee. He was later seen carrying a 22-caliber rifle in the vicinity of the scene of the crime and on the afternoon it was committed.

On the morning after the homicide appellant called at the store of Jeff Kidd in McCreary county and bought some candy, crackers, and a shirt. He paid for this merchandise with a voucher made payable to Cleve Spradlin, the decedent, and Mr. Kidd gave appellant in change $3 in cash and his own check for $4. Appellant then left that vicinity and was later apprehended near the Tennessee line, and when arrested he was wearing the decedent's clothes.

Appellant admitted that he killed the decedent, but said he did so in self-defense after decedent had struck at him with his dinner bucket, which he, decedent, was carrying. He testified that he had borrowed the gun to hunt squirrels and rabbits and met with the decedent in

the woods at the place the homicide occurred. After meeting with decedent, he tells what happened, as follows:

"Q. You stopped on the road or met this man or how? A. I stopped. I was wet and stopped and built up a fire.

"Q. Been raining that day? A. Yes, and built up a fire and standing drying when he come along and spoke to me and I spoke. He said, 'Your ready to go,' and I said, 'No, I'm not good and dry yet.' He said 'You'll get wetter by the time you get there, come on and let's go,' and I said, 'I can go,' and I started on with him.

"Q. Go on and tell what happened. How far did you go with him? A. He commenced telling me,—raised a fuss with me about being drunk Sunday night before that and I said I was at Cal's in the bed that night and he said I wasn't. I told him I could prove I was, I was at home at Cal's in bed the Sunday night before that. He said that would end the trouble right there, that he would just bust the dinner bucket over my head. He struck at me and I jumped and dodged it and as I jumped I pulled the hammer back on the gun and he made at me and I pulled the trigger. I don't know whether I hit him or not, anyway he sorter fell on his knees and hands and started to get up again and I shot him back there. [Indicating.]

"Q. Well, then, did anybody else help you do that? A. No."

He also testified that he dragged the body of deceased and threw it over the cliff at the place where it was found, which he estimated to be about 100 yards. He said he then threw his gun away. He admitted that he took from decedent's body the clothes and perhaps other trinkets found on him at the time he was arrested, including shoes, gloves, cap, and lamp and flask and the voucher mentioned above. He was further asked and answered as follows:

"Q. Well, why did you do that? A. Well, I just wanted them, I reckon.

"Q. Well, was it before or after you killed the fellow? A. After.

"Q. When did you take them off him? A. After I throwed him over the cliff.

"Q. You say you don't know when the notion came to you to take his clothes? A. No, I don't."

No other witness testified in appellant's behalf, and the case was submitted to the jury upon the evidence adduced for the commonwealth and his own evidence indicated above.

Appellant filed motion and grounds for a new trial consisting of several items, one of which is "that the verdict found and returned is against the law, or evidence, and is not supported by the evidence heard on the trial."

It is insisted for the commonwealth that robbery was the motive of the killing. The proven facts and circumstances strongly indicate that such was the motive. The appellant admitted that after he killed the deceased he dragged his dead body about 100 yards and threw it over a cliff and says that he did so because he wanted to get it out of sight. He then robbed the dead body of practically all of clothes, voucher, and perhaps other trinkets, and set out on his journey toward Tennessee. He said he did not know when he conceived the idea of taking decedent's clothes. Evidently if he killed decedent in self-defense this idea did not occur to him until after he killed decedent. His statement that he does not know when the idea occurred to him might warrant the inference that he conceived this idea before he killed decedent and that the taking of his clothes was the motive of the homicide. Such is not consistent with the conduct of a person who has been forced, as he may believe, to kill his fellow man in self-defense. The self-defense story detailed by appellant, viewed in the light of the proven facts and circumstances including his own testimony, is not very persuasive. We think the evidence is amply sufficient to support the verdict of the jury.

Another ground urged for a new trial is that the arresting officer obtained from appellant a confession by quizzing him while arrested and in their custody and by threats of violence. The only basis for this contention is the affidavit of appellant in support of his motion and grounds for a new trial, wherein he stated that Sam Thomas, one of the arresting officers, opened a razor and said to him, in substance, "If you deny it I

will cut your G—— d—— head off." There was no effort made by the commonwealth to introduce any form of confession made by the· appellant, and no evidence of such was introduced before the jury, except on cross-examination the attorney for the commonwealth asked him ·if he had not told different stories about the killing and had told that Willie Watson did the shooting, and he answered: "I don't remember." He was also asked:

"And you started to plead guilty at the start here, too, didn't you? * * * A. Yes, sir.

"Q. Why did you change your plea from guilty to not guilty? A. Well, I reckon I am still guilty."

Later, on redirect examination, he explained in substance that he meant that he was guilty of killing the deceased, and he thought he had to plead guilty. It appears that he tried to explain that he was guilty of the homicide but not guilty of murder. But, be that as it may, the jury had the benefit of his explanation, which, of course, was plausible, and the jury had the right to give it such credit and weight as it saw proper. In the circumstances it could not have been prejudicial. The sheriff, Roundtree, testified that appellant admitted the killing, but no objections were made to this evidence. But there is not a syllable of evidence conducing to show any duress or other improper methods of obtaining any confessions. In the circumstances appellant's rights could not have been prejudiced by the evidence of Roundtree, because appellant admitted and testified before the jury that he killed deceased and plead self-defense as above indicated. On direct examination he was asked by his own counsel:

"Q. Do you know anything about the killing of Spradlin? A. Well, I reckon I do.

"Q. Who killed him? A. I did."

Appellant next insists that the trial court and commonwealth's attorney made prejudicial remarks in the hearing of the jury, to the effect that their understanding was that the plea would be guilty. If such remarks were made, it is not established by the record. No mention was made of these alleged remarks in the motion and grounds for a new trial or in the bill of exceptions. It only appears in the affidavit of L. G. Campbell, but the affidavit is not made a part of the record by any

order of the trial court, nor does it appear in the bill of exceptions. In Bruner v. Commonwealth, 225 Ky. 713, 9 S. W. (2d) 1080, 1081, in discussing a like question, we said:

"There is nothing showing any exception to this, if it happened, other than the statement in the motion and grounds for a new trial. It is not included in the bill of exceptions, and we have no means of knowing whether the happening took place or not. * * * It is true that affidavits were filed, seeking to establish that these things happened, but this court, in such a case as this, cannot determine what happened during the course of the trial from affidavits filed in support of the motion and grounds for a new trial. * * * The purpose of a bill of exceptions is to bring to the attention of the court things which happened during the course of the trial and which do not appear of record, and the bill must show what happened and what objections were made. This is what is required by the provisions of section 337 of the Civil Code. There is no place for an affidavit to establish occurrences during the progress of a trial."

For reasons indicated, we are precluded from considering this complaint.

Another complaint is that the court should have advised appellant of the effect of the plea of guilty. The record discloses no reason why the court should have thus advised appellant, inasmuch as he entered a plea of not guilty. This contention evidently is based upon the alleged remarks of the judge and the commonwealth's attorney indicated above. We find no merit in this contention.

It is further insisted that two members of the jury made statements to the effect that if they were on the jury they would inflict the death penalty. Again, there is nothing in the bill of exceptions concerning this statement. We find it only in the motion and grounds for a new trial. In the affidavit of G. W. Stevens in support of the motion, it is stated that he had been told that certain jurors were closely related to the deceased and his widow and that certain jurors made statements concerning the guilt of the defendant before they were accepted on the jury, and that he had made much investigation to see what he could find out concerning these

things, but so far he had been unable to ascertain the facts, which he believes are true. Thus it will be seen that this complaint is not supported by an affidavit even though such affidavit had been filed by order of the court or otherwise properly authenticated as part of the record. Hence there is no merit in this complaint. Mansfield v. Comm., 163 Ky. 488, 174 S. W. 16; Jeffries v. Comm., 255 Ky. 365, 74 S. W. (2d) 203.

The next insistence is that a mob spirit existed among the people in the community where appellant was tried. The record discloses no showing of any acts, conduct, or statement of persons attending the trial of appellant, as citizens or officials, indicating the slightest hostility toward him, and there is nothing to indicate that the jury was influenced in that respect, and therefore no presumption exists that the jury was influenced by any mob spirit, if such existed. Gray et al. v. Comm., 252 Ky. 830, 68 S. W. (2d) 430. And, furthermore, appellant made no motion for a change of venue or for a continuance, and this insistence now comes too late as well as being unsupported by the record.

It is also contended that an instruction on insanity of the appellant should have been given. Insanity was not offered or relied upon as a defense, nor was there any evidence introduced to support such a defense. It is argued, however, that appellant's conduct after he killed deceased, in that he put on the clothes of the deceased and walked for miles through the country where deceased was known, and also cashed the voucher at the store of a neighbor merchant, is evidence that he was not a man of ordinary intellect. It may be conceded that appellant exercised bad judgment, but it was not such evidence of insanity, in the meaning of the law, as to require an instruction submitting to the jury the question whether or not he was insane. Appellant's testimony as it appears in the record does not indicate, to our minds, that he was insane or even what ordinarily may be said to be feeble-minded. The trial court had the benefit of its personal observation of appellant, and had it appeared that he was insane, no doubt the court would have instructed the jury on that question, or at least, after deliberation, it would have granted him a new trial on that ground. We do not think any reversible error was committed by the failure of the court to give such instruction.

Lastly, it is insisted that appellant did not have sufficient time to prepare his case. He was indicted on the 1st day of April, 1935, and tried on the 10th day of the same month. The record discloses that G. W. Stevens was appointed by the court to defend appellant on the day the case was called for trial, but his counsel asked for no continuance, made no motion for time, but, on the contrary, he announced ready for trial, and his failure to then raise this question precludes him from now doing so. Keith v. Comm., 195 Ky. 635, 243 S. W. 293.

Finding no error prejudicial to the substantial rights of the appellant, the judgment is affirmed.

The whole court sitting.